Neil K. Sawhney (State Bar No. 300130)
GUPTA WESSLER PLLC
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
neil@guptawessler.com

Matthew H.W. Wessler*
GUPTA WESSLER PLLC
1035 Cambridge Street, Suite One
Cambridge MA 02141
(617) 286-2392
matt@guptawessler.com

Kristi C. Kelly*
Andrew J. Guzzo*
KELLY GUZZO PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7570
kkelly@kellyguzzo.com
aguzzo@kellyguzzo.com

*Attorneys for Plaintiff Regina L. Nolte*
* *pro hac vice* forthcoming

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### San Francisco Division

| | |
|---|---|
| REGINA L. NOLTE, *individually and on behalf of others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>DINO FRANKLIN JR., TRIBAL CHAIRMAN OF THE KASHIA BAND OF POMO INDIANS OF THE STEWARTS POINT RANCHERIA TRIBAL COUNCIL, *in his official and individual capacities*; GLENDA JACOB MCGILL, VICE CHAIR OF THE KASHIA BAND OF POMO INDIANS OF THE STEWARTS POINT RANCHERIA TRIBAL COUNCIL, *in her official and individual capacities*; TARA ANTONE, SECRETARY OF THE KASHIA BAND OF POMO INDIANS OF THE STEWARTS POINT RANCHERIA TRIBAL COUNCIL, *in her official and individual capacities*; SAVANNAH GOMES, TREASURER OF THE KASHIA BAND OF POMO INDIANS OF THE STEWARTS POINT RANCHERIA TRIBAL COUNCIL, *in her official and individual capacities*; MARLENE ADAM, MEMBER AT LARGE OF THE KASHIA BAND OF POMO INDIANS OF THE STEWARTS POINT RANCHERIA TRIBAL COUNCIL, *in her official and individual capacities*; SUSAN G | Civil Action No. _____<br><br>**COMPLAINT**<br><br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

SMITH, MEMBER AT LARGE OF THE KASHIA BAND OF POMO INDIANS OF THE STEWARTS POINT RANCHERIA TRIBAL COUNCIL, *in her official and individual capacities*; ELAYNE MURO, MEMBER AT LARGE OF THE KASHIA BAND OF POMO INDIANS OF THE STEWARTS POINT RANCHERIA TRIBAL COUNCIL, *in her official and individual capacities*; NAOMI ATCHLEY, *in her individual capacity*; ADRIENNE ANTONE, *in her individual capacity*; DERICK FRANKLIN, *in his individual capacity*; SANDY PINOLA *in her individual capacity*; and JOHN DOES NOS. 1-20,

Defendants.

---

Plaintiff, Regina L. Nolte, on behalf of herself and all individuals similarly situated, by counsel, submits this Class Action Complaint against the Defendants and alleges as follows:

**PRELIMINARY STATEMENT**

1.     This is a case about the making and collection of unlawful loans by an unconventional predatory lender: Kashia Services, an entity formed by the Kashia Band of Pomo Indians of the Stewarts Point Rancheria (the "Kashia Band of Pomo Indians" or the "Tribe"), a federally recognized Native American tribe located in Sonoma County, California. These loans carry triple-digit interest rates in excess of 700% and are illegal in many states, such as Indiana, where Plaintiff Regina L. Nolte resides.

2.     Predatory lenders target vulnerable borrowers and, left unregulated, can economically devastate borrowers and their communities. Consumers often renew their loans or take out new loans when they are unable to pay the original loans off, creating an unending cycle of mounting debt.

3.     "From times immemorial," state governments have sought to "protect desperately poor people from the consequences of their own desperation" through usury laws. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013). Commonly, these state laws will cap the amount of interest a lender is allowed to pay and require lenders to be licensed in the state where the consumer is located. Such laws not only protect vulnerable borrowers, but they also promote the "common good" as usury "weakens the social and economic foundations of a country." Pope Francis, *Address to National Anti-Usury Council* (Feb. 3, 2018).

4.     Kashia Services, which holds itself out as an economic-development arm and instrumentality of the Kashia Band of Pomo Indians, has made and collected on illegal loans across the country under several different names, including Oxford Financial Services; Spring Water Financial; Loan Star Cash; Solid Oak Finance; Geyser Lending; ReadySetGo Finance; Napa Lending; Inbox Loan; NetPDL; PDY Services; PDLNow; QXL Online; 123 Wages; ABC Wages; Inbox Credit; and Better Day Loans.

5.     Although the Kashia Band of Pomo Indians may be motivated by its intention to advance its own community, the Tribe's effort to advance itself exploits desperately poor people in other communities who, in their moment of despair, agree to take a small dollar loan with triple-digit interest rates. The excessive interest rates charged by Kashia Services are far in excess of the interest rates permitted by the states in which the company makes and collects on its loans. For example, Ms. Nolte obtained her loan while in Indiana. Her loan had an interest rate of 734.28%—a rate almost 50 times higher than the maximum permitted under Indiana law.

6.     By entering into Indiana to make usurious loans to Indiana consumers and unlawfully collect from their Indiana bank accounts, the Kashia Band of Pomo Indians has violated applicable Indiana and federal law. It is well settled that "[a]bsent a federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-

discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973).

7.     This lawsuit challenges the Defendants' and others' collection of unlawful debts through its usurious lending enterprise. In particular, the Defendants' conduct violates the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. The Defendants and others collected millions of dollars in unlawful debts and conspired with each other and others to repeatedly violate state lending laws resulting in the collection of unlawful debts from Ms. Nolte and the class members. *See* 18 U.S.C. § 1962(c)–(d).

8.     Ms. Nolte also asserts a class claim for violations of Indiana's usury and licensing laws. Because the enterprise's loans violated Indiana's usury and licensing requirements, such loans are null and void and the lender and any person violating the applicable laws are liable to Ms. Nolte and the class members. *See* Ind. Code §§ 24-4.5-7-409, 24-4.5-5-202.

## JURISDICTION AND VENUE

9.     The Court has original jurisdiction over Ms. Nolte's Racketeer Influenced and Corrupt Organizations ("RICO") under 18 U.S.C. § 1965 and 28 U.S.C. § 1331, and supplemental jurisdiction over her state-law claims under 28 U.S.C. § 1367.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(2) because Kaisha Services is located in Sonoma County. Venue is also proper in this Court pursuant to 18 U.S.C. § 1965(a) because the Defendants have transacted their affairs in this District.

11.     Intradistrict Assignment. This case is properly assigned to the San Francisco Division of this Court under Civil Local Rule 3-2(c), because a substantial part of the events or omissions which give rise to the claims alleged herein occurred in Sonoma County.

## PARTIES

12.     Plaintiff Regina L. Nolte is a natural person residing in Indiana.

13.     Dino Franklin Jr. is the Tribal Chairman of the Kashia Band of Pomo Indians Tribal Council. He is sued in his official and individual capacities.

14.     Glenda Jacob McGill is the Vice Chair of the Kashia Band of Pomo Indians Tribal Council. She is sued in her official and individual capacities.

15.     Tara Antone is the Secretary of the Kashia Band of Pomo Indians Tribal Council. She is sued in her official and individual capacities.

16.     Savannah Gomes is the Treasurer of the Kashia Band of Pomo Indians Tribal Council. She is sued in her official and individual capacities.

17.     Marlene Adam is a Member At Large of the Kashia Band of Pomo Indians Tribal Council. She is sued in her official and individual capacities.

18.     Susan G. Smith is a Member At Large of the Kashia Band of Pomo Indians Tribal Council. She is sued in her official and individual capacities.

19.     Elayne Muro is a Member At Large of the Kashia Band of Pomo Indians Tribal Council. She is sued in her official and individual capacities.

20.     Naomi Atchley is a natural person residing in California. She is or has previously served as a chairperson of the Kashia Services Board of Directors.

21.     Adrienne Antone is a natural person residing in California. She is or has previously served as a chairperson of the Kashia Services Board of Directors.

22.     Derick Franklin is a natural person residing in California. He is or has previously served as a chairperson of the Kashia Services Board of Directors.

23.     Sandy Pinola is a natural person residing in California. She is or has previously served as a chairperson of the Kashia Services Board of Directors.

24.     Defendant John Doe Nos. 1-20 are unidentified parties who participated in the enterprise with the Defendants, including parties who have funded, serviced, collected, and profited from the illegal loans at issue in this case.

## FACTUAL ALLEGATIONS

**A.     The tribal lending model was developed to evade state and federal consumer protections.**

25.     In recent years, predatory lenders developed various schemes in an attempt to evade applicable state and federal protections for borrowers.

26.     In one scheme—the so-called "rent-a-bank" strategy—payday lenders convinced banks headquartered in states with high (or nonexistent) usury limits to form a lending venture in order to capitalize on the fact that the bank was obligated to comply only with the usury law of its home state, even for loans made elsewhere.

27.      Federal banking regulators shut down these rent-a-bank schemes. *See* Michael A. Stegman, *Payday Lending*, 21 J. Econ. Perspectives 169, 178–79 (2007) (describing rent-a-bank scheme and regulatory reaction).

28.     After the rent-a-bank scheme's demise, several predatory lenders turned to a new model to facilitate their illegal lending businesses: the tribal lending model. Using this model, the predatory lender—which does most or all of its lending over the internet—affiliates with a Native American tribe to insulate itself from federal and state law by purporting to piggy-back on the tribe's sovereign legal status and its general immunity from suit under federal and state laws.

29.     In order to protect the nontribal participants in the enterprise, the tribe will agree to take certain precautions to protect their identities and to make the business appear as if it is solely managed by and beneficial to the tribe.

6

30. Like the rent-a-bank scheme, this tribal lending model often flouts state lending laws. The loans are aggressively marketed, created, and collected in the state where the consumer resides and thus are subject to the consumer's state licensing and usury laws. And, it is settled law that "[a]bsent a federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148 (1973).

31. In recent years, these tribal lending schemes have come under increasing scrutiny from courts and regulators. Two prominent perpetrators were recently convicted and sentenced to prison for their roles in such schemes.[1]

**B.    State licensing and usury laws protect consumers like Ms. Nolte from the Defendants' conduct.**

32. Ms. Nolte received a usurious loan from Kashia Services through its subsidiary Oxford Financial Services.

33. Ms. Nolte's loan had an interest rate of 734.28%.

34. This usurious loan violated Indiana's laws in three fundamental respects: (1) it was made without the license required by Indiana law; (2) it was made in excess of Indiana's interest rate caps for licensed lenders, which varies from 10% to 15% for loans of less than $550; and (3) it was made in excess of Indiana's general usury cap on consumer loans, which prohibits a finance charge in excess of 25%.

---

[1] *See* U.S. Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; U.S. Attorney's Office, Eastern District of Pennsylvania, *Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case*, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

35.     Each of these violations of Indiana law independently renders Ms. Nolte's loan void, and she is thus not obligated to pay either the principal or loan finance charge. *See* Ind. Code Ann. §§ 24-4.5-5-202, 24-4.5-7-409.

36.     Further, Indiana law provides consumers, such as Ms. Nolte, with a private right of action to recover all principal, interest, and any other charges from the loan *and* statutory damages of $2,000 per violation. *See* Ind. Code Ann. §§ 24-4.5-5-202, 24-4.5-7-409.

37.     Indiana's lending and usury protections are a part of Indiana's clearly delineated public policy against usurious loans and predatory lending.

38.     It is unsurprising that so many states have enacted laws similar to Indiana's, given that "[u]sury legislation to cap interest rates on loans predates the founding of our country." *Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009) (citing Christopher Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minn. L. Rev. 1110, 1116 n.13 (2008)).

39.     "Indiana's first usury statutes were passed before the turn of the 20th century . . . ." *Payday Today*, 903 N.E.2d at 1061. And, Indiana's Small Loans Act was enacted in 2002 to specifically respond to the growth of predatory payday lenders similar to Kashia Services. *Id.*

40.     Consumer protection statutes such as Indiana's lending and usury laws are necessary to protect financially vulnerable consumers. As the Indiana Court of Appeals has observed, the market for these types of loans "is made up of consumers who have personal checking accounts, but who are stretched to the limit financially. These consumers are not even living paycheck to paycheck, but are borrowing against their next paycheck to meet living expenses." *Id.* (quoting *Cash in a Flash, Inc. v. McCullough*, 853 N.E.2d 533 (Ind. Ct. App. 2006)).

41.     Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a

repayment system that involves the lender withdrawing funds directly from the borrower's bank account." *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

42. Unfortunately, despite the multitude of state and federal protections to prevent usurious lending, predatory financial services remain "heavily marketed to financially vulnerable consumers." *See CFPB Finalizes Rule To Stop Payday Debt Traps*, CFPB (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/.

43. The collection of unlawful and usurious debt continues to be a major problem, in part because the profits to be realized by small, high interest loans are so high that illegal lenders are willing to take on the significant risk of litigation and liability for their violations of state and federal law.

44. Many other states recognize the same public policy against usury and have adopted laws similar to Indiana's.[2] In these states, as in Indiana, Kashia Services is not permitted to lend, and its lending agreements are invalid and uncollectable.

---

[2] Those states include Alabama, Arizona, Connecticut, Florida, Georgia, Idaho, Illinois, Kentucky, Massachusetts, Maryland, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oregon, Rhode Island, South Dakota, Virginia, and West Virginia. See Ala. Code § 5-18-4 (loans made without a license "shall be void"); Ariz. Rev. Stat. § 6-613(B) (loans that charge illegal finance charges are "voidable"); Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); Fla. Stat. § 516.02 (loans made with excessive interest rates are "not enforceable"); Ga. Code § 16-17-3 (loans made without a license "shall be void ab initio"); Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); 815 Ill. Comp. Stat. 122/4-10 (payday loans made without a license "shall be null and void"); Ind. Code Ann. § 24-4.5-5-202 (loans made without the proper authority are "void and the debtor is not obligated to pay either the principal or loan finance charge"); Ky. Rev. Stat. Ann. § 286.4-991 (loans made without a license are void); Mass. Gen. Laws Ann. ch. 140, § 110 (small loans made without a license are void); Md. Code, Com. Law § 12-314 (small loans made without a license that charge excessive interest rates are "unenforceable"); Minn. Stat. §§ 47.60, 47.601 (provisions in loan contracts charging excessive interest rates are void and unenforceable); Minn. Stat. Ann. § 56.19 (authorizing debtor to recover all amounts paid on loans made in violation of licensing requirements); Mont. Code § 31-1-712 (Any deferred deposit loan

## C. The Kashia Services lending enterprise was established to evade usury and licensing laws.

45. The Kashia Band of Pomo Indians of the Stewarts Point Rancheria is a federally recognized Indian tribe located in Sonoma County, California.

46. The Stewarts Point Rancheria is located approximately 60 miles northwest of the city of Santa Rosa.

47. Upon information and belief, the Defendants and others established Kashia Services, formerly Kashia Lending Enterprise, in or around 2013 and began making and collecting on usurious loans.

48. Kashia Services and its subsidiaries are located in Santa Rosa, California. *See, e.g.*, Oxford Funding Services, Need to Contact Us?, *available at* https://www.oxford-funding.com/contact-us (last visited June 25, 2020) (indicating that the lending entity's address is P.O. Box 93, Santa Rosa, CA 95402).

49. In order to protect nontribal outsiders that are realizing the vast majority of the profits from the illegal lending enterprise, the Kashia Band of Pomo Indians have adopted various ordinances and laws to be used by the illegal lending enterprise to support Kashia Services' and its subsidiaries' claims of sovereign immunity.

---

made by an unlicensed lender "is void, and the unlicensed person may not directly or indirectly collect, receive, or retain any loan principal, interest, fees, or other charges related to the loan"); N.H. Rev. Stat. Ann. § 399-A:23 (any contract for small loan by unlicensed lender is "null and void"); N.J. Stat. Ann. § 17:11C-33 (consumer loans are void if made without a license); N.M. Stat. Ann. § 58-15-3 (small loans made without a license are void); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); N.Y. Banking Law § 355; N.C. Gen. Stat. Ann. § 53-166 (small loans made without a license are void); Ohio Rev. Code Ann. § 1321.02 (small loans made without a license are void); Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); 6 R.I. Gen. Laws Ann. § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made without a license are "void and uncollectible"); Va. Code §§ 6.2-1501(A), 6.2-303(A), 6.2-1541(A); W. Va. Code § 46A-5-101 (loans made in violation of Consumer Credit and Protection Act are "void and the consumer is not obligated to pay either the principal or the loan finance charge").

50. For example, on the face of the Kashia Band of Pomo Indians' laws, it appears that the Kashia Band of Pomo Indians has the sole interest in and responsibility for Kashia Services and its business operations.

51. However, upon information and belief, Kashia Services has entered into agreements with nontribal outsiders giving away significant interests and control in the business.

52. Additionally, in 2019, the Kashia Band of Pomo Indians adopted Ordinance 14, which designates the allocations of all "net revenues" from Kashia Services and its subsidiaries to benefit the tribe.

53. However, upon information and belief, the "net revenues" that are being distributed under Ordinance 14 represent merely a fraction of the net profits from the lending business.

54. Upon information and belief, the Defendants, the Kashia Band of Pomo Indians, Kashia Services, and others have created a structure through which the vast majority of the lending business's net income is realized by third parties not yet known to Ms. Nolte, while Kashia Services can technically claim that all of the revenues are benefitting the tribe.

55. Similar tribal lending enterprises elsewhere have used a "service fee" to transfer the vast majority of the profits to nontribal outsiders. By structuring the business in this manner, the tribe can ostensibly claim that all of the net revenues of the business were benefitting the tribe, even though the tribe was in reality receiving a miniscule portion of the profits.

**D.     The role of the Kashia Services' Board of Directors in the illegal lending business.**

56. Kashia Services is managed by a Board of Directors composed of members appointed by the Kashia Band of Pomo Indians Tribal Council. The Kashia Services Board of Directors is responsible for the management and oversight of all of its subsidiaries.

57.     The Kashia Services Board of Directors operates under the oversight and management of the Kashia Band of Pomo Indians Tribal Council. The Tribal Council's management over Kashia Services includes appointment of Board members, approval of all contractual waivers of sovereign immunity, approval of procurement and operating budgets, and significant oversight over the operations.

58.     Upon information and belief, Kashia Services and its subsidiaries do not have any operations located on tribal land.

59.     Instead, any employees and operations of Kashia Services and its subsidiaries that are controlled by its own employees are operated in California rather than on tribal land.

60.     Additionally, upon information and belief, Kashia Services and its subsidiaries are operated by third parties that are not located on tribal lands. It is these nontribal outsiders—not the Kashia Band of Pomo Indians—that handle and control the underwriting, risk assessment, compliance, customer complaints, accounting, lead generation, collections, and website management for the business.

61.     Upon information and belief, Kashia Services and the Kashia Band of Pomo Indians have joined one or more association-in-fact enterprises with individuals outside of the tribe and nontribal investors to collect on usurious loans throughout the country.

62.     The Defendants and others agreed to establish the illegal lending businesses in order to make and collect on illegal loans in violation of state usury and licensing requirements.

63.     Kashia Services makes and collects on usurious loans under various names, including Oxford Financial Services; Spring Water Financial; Loan Star Cash; Solid Oak Finance; Geyser Lending; ReadySetGo Finance; Napa Lending; Inbox Loan; NetPDL; PDY Services; PDLNow; QXL Online; 123 Wages; ABC Wages; Inbox Credit; and Better Day Loans.

64.     Upon information and belief, Kashia Services created this array of different electronic storefronts to facilitate the illegal lending enterprises and the distribution of the profits from the illegal loans to the various nontribal outsiders who are involved. For example, the resolution establishing Inbox Loan explains that Kashia Services created Inbox Loan "for the purpose of maintaining in a separate and segregated fashion property, funds, accounts and other assets related to that business."

65.     Additionally, upon information and belief, the vast majority of the profits made under these names did not go to the Kashia Band of Pomo Indians or Kashia Services but, instead, went to nontribal outsiders who paid for the affiliation with the Kashia Band of Pomo Indians to protect themselves from liability for their violations of state and federal laws.

66.     Upon information and belief, the Kashia Band of Pomo Indians Tribal Council, Kashia Services, the Defendants, and others agreed that Kashia Services would use money provided by nontribal participants in the enterprise to make consumer loans using excessive interest rates far in excess of the amount required by state law.

67.     Upon information and belief, nontribal participants exerted significant control over the lending business.

68.     Upon information and belief, the vast majority of the profits from the loans did not go to Kashia Services or the Kashia Band of Pomo Indians.

69.     For example, upon information and belief, John Kimball of Kansas City, Missouri and his businesses (ARCSUN Services, LLC and Globex Holdings, LLC) are beneficiaries of one or more of Kashia Services online lending businesses.[3]

---

[3] Kansas City, Missouri is a hotbed of illegal payday lending, and John Kimball has been involved in other illegal lending businesses with his associates, Dell Kimball and Mark Curry.

70.   Upon information and belief, Kashia Services entered into agreements with John Kimball and his businesses to make loans at usurious interest rates.

71.   Upon information and belief, John Kimball is responsible for one or more of Kashia Services' electronic storefronts and was responsible for managing the business. For example, John Kimball registered the domain name for Geyser Lending using his Arc Sun Services.

72.   Upon information and belief, John Kimball and his businesses receive the vast majority of the profits from the ReadySetGo Finance and Geyser Lending businesses, which purport to benefit the Kashia Band of Pomo Indians. Additionally, upon information and belief, John Kimball and his businesses control these lending businesses, which purport to be operated by the Kashia Band of Pomo Indians.

73.   And, upon information and belief, the vast majority of the business operations of Kashia Services and its subsidiaries are not performed by tribal employees or on tribal lands. For example, when a customer contacts Oxford Financial's telephone number, the call is handled by a call center in Utah.

74.   Upon information and belief, Dino Franklin Jr. and Reno Franklin, Jr. were instrumental in facilitating the creation of the illegal lending business and each agreed to the collection of unlawful debt.

75.   Both Dino Franklin, Jr. and Reno Franklin, Jr. signed different versions of Tribal Ordinance # 13 to facilitate the illegal lending enterprise.

76.   Upon information and belief, Dino Franklin Jr., Reno Franklin, Jr., Glenda Jacob McGill, Tara Antone, Savannah Gomes, Marlene Adam, Susan G. Smith, and Elayne Muro each agreed to the collection of unlawful debt and to facilitate the illegal lending enterprise.

77.   As members of tribal council, Dino Franklin Jr., Reno Franklin, Jr., Glenda Jacob McGill, Tara Antone, Savannah Gomes, Marlene Adam, Susan G. Smith, and Elayne Muro have

or have had the authority to direct the affairs and control Kashia Services and all the operations associated with the Kashia Services loans even if it has chosen to allow nontribal third parties to instead control the lending business.

78.     Additionally, upon information and belief, Naomi Atchley, Adrienne Antone, and Derick Franklin have been instrumental in furthering the illegal lending enterprise and various operating names.

79.     Upon information and belief, as a Board Member of Kashia Services, Naomi Atchley has engaged in the collection of unlawful debt.

80.     Upon information and belief, as a Board Member of Kashia Services, Adrienne Antone has engaged in the collection of unlawful debt.

81.     Upon information and belief, as a Board Member of Kashia Services, Derick Franklin has engaged in the collection of unlawful debt.

82.     Upon information and belief, as a Board Member of Kashia Services, Sandy Pinola has engaged in the collection of unlawful debt.

83.     Upon information and belief, Naomi Atchley, Adrienne Antone, Derick Franklin, and Sandy Pinola have each participated in forming subsidiaries of Kashia Services for the purpose of collecting illegal interest.

84.     For example, Adrienne Antone, Sandy Pinola, and Derrick Franklin each signed and voted in support of Resolution # KS-08262016-01 establishing Inbox Loans, one of Kashia Services' subsidiaries and electronic storefronts. The resolution authorizes Inbox Loans to obtain a new employer identification number, establish bank accounts, and designate authorized signatories for such account. Without their participation, Inbox Loans could not have obtained an employee identification number and created the bank accounts necessary to collect unlawful interest.

85.     Upon information and belief, Adrienne Antone, Sandy Pinola, Derrick Franklin, and Naomi Atchley were responsible for forming numerous subsidiaries of Kashia Services in the same manner as Inbox Loans.

86.     Ms. Nolte has identified sixteen electronic storefronts each claiming that they are a subsidiary of Kashia Services. These subsidiaries of Kashia Services are a part of the association-in-fact enterprise to collect unlawful debt.

87.     Upon information and belief, Kashia Services continues to make and collect on illegal loans because Kashia Services and the Kashia Band of Pomo Indians Tribal Council allows it to do so.

88.     Without the Defendants' participation in the enterprise, Ms. Nolte's loans never would have been made and collected on.

89.     For each operating name under which Kashia Services does business, it has a separate website with a disclaimer such as the following:

> Oxford Financial Services is a sovereign enterprise wholly-owned by Kashia Services, an economic development arm and instrumentality of, and wholly-owned and controlled by the Kashia Band of Pomo Indians of the Stewart's Point Rancheria, a federally-recognized sovereign American Indian tribe.

90.     However, upon information and belief, the subsidiaries of Kashia Services are not actually controlled by the Kashia Band of Pomo Indians. Upon information and belief, it is nontribal outsiders—not the Kashia Band of Pomo Indians—that handles and controls the underwriting, risk assessment, compliance, customer complaints, accounting, lead generation, collections, and website management for the business.

91.     Thus, these statements were designed to mislead consumers that they are borrowing from a lender that is wholly owned and operated by a sovereign nation and deter consumers from seeking claims for Kashia Services abusive practices.

92. Each of the Defendants, Kashia Services, and the Kashia Band of Pomo Indians understands that the illegal lending business engages in usurious lending in violation of state and federal law and engages in multiple abusive practices.

93. Each of the Defendants is aware that Kashia Services and its subsidiaries have been the target of class-action litigation challenging the lending business's practices. *See Gonzalez v. Inbox Loan*, No. 1:19-cv-327 (M.D.N.C. 2019); *Jones v. Franklin*, 2:18-cv-02982 (E.D. Pa. 2018).

94. Additionally, each of the Defendants are aware that numerous consumers have complained regarding abusive lending practices used by Kashia Services. For example, the Washington State Department of Financial Institutions has issued an alert about unlicensed lending conducted by Kashia Services and its storefronts in Washington. *See Kashia Band of Pomo Indians of the Stewarts Point Rancheria Not Licensed in Washington State*, Wash. Dep't. of Fin. Inst., (updated Feb. 2020), https://dfi.wa.gov/consumer/alerts/kashia-band-pomo-indians-stewarts-point-rancheria-not-licensed-washington-state.

**E. The Kashia Band of Pomo Indians adopted a sham dispute resolution system to deprive consumers of remedies.**

95. As discussed above, Kashia Services, the Kashia Band of Pomo Indians, and others (including, upon information and belief, John Kimball and his businesses) established one or more association-in-fact enterprises to evade state usury laws.

96. One of the most important aspects of the tribal lending business is the loan agreements that consumers must execute to receive a loan from Kashia Services.

97. These lending agreements include a waiver of all state and federal claims and a forum-selection provision requiring use of a sham tribal dispute-resolution mechanism.

98. Upon information and belief, Ms. Nolte's loan agreement is a boilerplate document that Kashia Services uses for all of its loan agreements.

99.     Kashia Services, through its subsidiaries, offers its loan agreement to consumers on a take-it or leave-it basis.

100.     Ms. Nolte's consumer loan agreement includes a "Governing Law" provision that waives the application of all state and federal laws. It provides that only Tribal law applies to any dispute between the consumer and anyone associated with the loan, including nontribal participants such as John Kimball and his businesses.

101.     Additionally, Ms. Nolte's loan agreement includes a "Tribal Dispute Resolution Procedure Provision" that requires consumers to pursue all claims against anyone associated with the loan—including nontribal participants who are not subject to the Tribe's jurisdiction such as John Kimball and his businesses—through the specified procedure.

102.     The "Tribal Dispute Resolution" procedure set out in Ms. Nolte's lending agreement is a sham. The agreement requires the consumer to bring any dispute first to Oxford Financial. If the consumer is unhappy with the resolution by Oxford Financial, then the consumer may seek review by Oxford Financial's parent company—Kashia Services.

103.     If still dissatisfied, the consumer's final option is to file a claim with the Kashia Lending Commission—which is controlled by the Kashia Band of Pomo Indians, one of the members of the illegal lending enterprise and the sole owner of Kashia Services and Oxford Financial.

104.     Further, upon information and belief, the Kashia Lending Commission was created for the specific purpose of furthering the illegal lending enterprise and protecting nontribal outsiders from liability for their violations of state and federal laws. In fact, the Kashia Lending Commission was formed by the same ordinance that initially established the Kashia Band of Pomo Indians' tribal lending business itself.

105. What is worse, even though Ms. Nolte's lending agreement requires her to comply with the procedural and substantive requirements of Tribal law, there is no readily available information to consumers regarding the Kashia Lending Commission or the procedures and regulations that govern it. Instead, the agreement states that "[c]opies of applicable Tribal laws may be obtained by contacting [Oxford Financial]." Thus, a consumer has to rely on and trust Oxford Financial to determine the "applicable" laws for any claims a consumer believes they may have. There is no way for a consumer to independently research Tribal laws.

106. This is a particularly onerous requirement in light of the very short timeframe—a matter of a few days—that the Tribal Dispute Procedure Provision provides for consumers to submit claims.

107. In Ms. Nolte's experience, Oxford Financial ignores or fails to respond in a timely manner to consumer claims and requests for tribal laws. On two occasions, Ms. Nolte has emailed Oxford Financial and requested a copy of the laws governing the contract, but both requests were ignored. Further, a copy does not appear to be available online on the Tribe's website or on any other online source.

108. Ms. Nolte's counsel was able to obtain a copy of the Kashia Band of Pomo Indians Customer Dispute Resolution regulation because it was attached as an exhibit in *Jones v. Franklin*, 2:18-cv-02982 (E.D. Pa. 2018), ECF No. 18-1.

109. It is not clear that the version of the regulation located by Ms. Nolte's counsel is the most current version of the regulation. The loan agreement's Tribal Dispute Resolution provision provides a consumer five business days from Kashia Service's final decision to file a formal complaint with the Kashia Lending Commission, while the regulation located by counsel provides a consumer only with 48 hours. At any rate, this short timeframe certainly prevents consumers like Ms. Nolte from adequately researching the Tribe's laws, including the history of each law.

110.    The regulation makes clear that the Kashia Lending Commission's decision is not subject to any appeal or review by any court—federal or state. The regulation does not explain how a consumer would enforce a favorable decision against the lender; it only contemplates that a consumer may receive an unfavorable decision and wish to appeal, but then explains that the consumer has no right to appeal.

**F.    The Defendants and others collected unlawful interest from consumers.**

111.    The Defendants, together with others not yet known to Ms. Nolte, marketed, initiated, and collected usurious loans throughout the country, including in Indiana and states with similar laws.

112.    The Defendants knew the loans were illegal under state usury and licensing laws, but they pursued the scheme anyway.

113.    They charged astronomical interest rates that far exceeded the rates allowed by applicable state law.

114.    For example, Ms. Nolte applied for and received a Kashia Services' loans from a personal electronic device while located in Indiana. Her loan agreement indicates that it was executed on March 30, 2018 at an IP address located in Indiana.

115.    Ms. Nolte used her Indiana address when applying for the loan, and she used her Indiana bank account with an Indiana ABA routing number to receive the loan and for the subsequent ACH debits to pay down the loan.

116.    Ms. Nolte's loan had an interest rate of 734.28%.

117.    The Defendants, together with others in the illegal lending enterprise, received no less than $100 from Ms. Nolte in connection with her loan—most of which was credited to interest and fees.

118. Upon information and belief, all of the Defendants' loans to consumers used excessive interest rates far in excess of applicable state laws. Upon information and belief, Kashia Services typically used interest rates in excess of 700%.

119. Accordingly, the loans were null and void under applicable state law, and it is unlawful for the Defendants, Kashia Services, and any of their affiliates to collect or receive any principal, interest, or charges whatsoever on said loans, including the amounts paid by Ms. Nolte.

120. The Defendants, Kashia Services, and its subsidiaries have made misleading and deceptive statements to consumers in the making and collection of the loans.

121. For example, Ms. Nolte has received numerous communications from Oxford Financial claiming that she has an outstanding balance due on her loan even though the loan was void and uncollectable under Indiana law.

122. Ms. Nolte received such a communication from Oxford Financial as recently as April 20, 2020, illegally asserting that she had an outstanding balance of $751.67 on her loan.

123. The communication also falsely stated that payment would result in the reduction of "negative statuses" on her credit reports.

124. Additionally, the communication claimed that Oxford Financial was a wholly-owned subsidiary of Kashia Services, which is "wholly-owned and controlled by the Kashia Band of Pomo Indians of the Stewart's Point Rancheria." This is deceptive because nontribal outsiders have significant control mechanisms over Kaisha Services' operations, as explained above.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of RICO, 18 U.S.C. § 1962(c), Collection of Unlawful Debt
### (CLASS CLAIMS AGAINST ALL DEFENDANTS
### IN THEIR INDIVIDUAL CAPACITIES ONLY)

125.    Ms. Nolte realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

126.    Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, Ms. Nolte brings this claim for herself and on behalf of the "RICO Class," initially defined as follows:

> *All individuals who: (1) entered into a loan agreement with any of Kashia Services' subsidiaries and/or operating names (including but not limited to Oxford Financial Services; Spring Water Financial; Loan Star Cash; Solid Oak Finance; Geyser Lending; ReadySetGo Finance; Napa Lending; Inbox Loan; NetPDL; PDY Services; PDLNow; QXL Online; 123 Wages; ABC Wages; Inbox Credit; and Better Day Loans); and (2) live in Indiana or another state where the debt was void.*

Ms. Nolte is a member of the RICO Class.

127.    **Numerosity. Fed. R. Civ. P 23(a)(1).** At this time, Ms. Nolte does not know the exact number of members of the RICO Class. However, based on the class sizes in similar cases, Ms. Nolte anticipates that there are likely thousands of members. Thus, the class is so numerous that joinder of all members is impracticable.

128.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The common questions include: (1) whether an association-in-fact enterprise existed; (2) whether the Defendants conducted the affairs or participated in the enterprise's affairs; (3) whether the loans are "unlawful debt" for purposes of RICO; (4) whether the Defendants violated RICO by collecting on the loans; and (5) what is the proper recovery for Ms. Nolte and the class members against the Defendants.

129. **Typicality. Fed. R. Civ. P. 23(a)(3).** Ms. Nolte's claims are typical of the claims of each putative class member. In addition, Ms. Nolte is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

130. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Ms. Nolte is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class she seeks to represent; she has retained counsel competent and experienced in such litigation; and she has and intends to continue to prosecute the action vigorously. Ms. Nolte and her counsel will fairly and adequately protect the interests of the members of the class. Neither Ms. Nolte nor her counsel have any interests which might cause them not to vigorously pursue this action.

131. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by the Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a single case.

132. As alleged, Kashia Services, the Kashia Band of Pomo Indians, and others established one or more association-in-fact enterprises to evade state usury laws.

133.   Defendants Dino Franklin Jr., Glenda Jacob McGill, Tara Antone, Savannah Gomes, Marlene Adam, Susan G Smith, Elayne Muro, Naomi Atchley, Adrienne Antone, Derick Franklin, and Sandy Pinola are each being sued in their individual capacities for their own conduct violating RICO, 18 U.S.C. § 1962(c).

134.   Ms. Nolte also asserts this count against Defendants John Doe Nos. 1-20 who are unidentified parties who participated in the enterprise with the Defendants.

135.   The Defendants are each a "person" as that term is defined in 18 U.S.C. § 1964(3).

136.   RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate."  18 U.S.C. § 1961(6).

137.   The Defendants violated 18 U.S.C. § 1962(c) by participating, directly or indirectly, in the conduct of the enterprise's affairs in the collection of unlawful debt.

138.   All of the loans made to RICO Class members and collected by the Defendants had interest rates far in excess of twice the enforceable rate in their states.

139.   Kashia Services holds itself out as an arm and instrumentality of the Kashia Band of Pomo Indians.

140.   As members of the Kashia Band of Pomo Indians Tribal Council, Defendants Dino Franklin Jr., Glenda Jacob McGill, Tara Antone, Savannah Gomes, Marlene Adam, Susan G Smith, and Elayne Muro are each involved in overseeing Kashia Services and its operations, and each have participated in the collection of unlawful debt.

141.   As members of the Kashia Band of Pomo Indians Tribal Council, Defendants Dino Franklin Jr., Glenda Jacob McGill, Tara Antone, Savannah Gomes, Marlene Adam, Susan G Smith, and Elayne Muro have managed the affairs of the association-in-fact enterprise.

142.    As alleged herein, Defendants Naomi Atchley, Adrienne Antone, Derick Franklin, and Sandy Pinola have each engaged in the collection of unlawful debt.

143.    Ms. Nolte and the RICO Class members were injured as a direct result of the Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the enterprise which would not have been made but for the Defendants' conduct.

144.    Accordingly, the Defendants are jointly and severally liable in their individual capacities to Ms. Nolte and the RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**SECOND CAUSE OF ACTION**
**Violation of RICO, 18 U.S.C. § 1962(d), Conspiracy to Collect Unlawful Debt**
**(CLASS CLAIMS AGAINST ALL DEFENDANTS**
**IN THEIR INDIVIDUAL CAPACITIES ONLY)**

145.    Ms. Nolte realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

146.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Ms. Nolte brings this claim for herself and on behalf of the "RICO Class," initially defined as follows:

> *All individuals who: (1) entered into a loan agreement with any of Kashia Services' subsidiaries and/or operating names (including but not limited to Oxford Financial Services; Spring Water Financial; Loan Star Cash; Solid Oak Finance; Geyser Lending; ReadySetGo Finance; Napa Lending; Inbox Loan; NetPDL; PDY Services; PDLNow; QXL Online; 123 Wages; ABC Wages; Inbox Credit; and Better Day Loans); (2) who live in Indiana or another state where the debt was void.*

Ms. Nolte is a member of the RICO Class.

147.    **Numerosity. Fed. R. Civ. P 23(a)(1).** At this time, Ms. Nolte does not know the exact number of members of the RICO Class. However, based on the class sizes in similar cases, Ms. Nolte anticipates that there are likely thousands of members. Thus, the class is so numerous that joinder of all members is impracticable.

148. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The common questions include: (1) whether an association-in-fact enterprise existed; (2) whether the Defendants knew of and agreed to the overall objective to collect unlawful debt; (3) whether the loans are "unlawful debt" for purposes of RICO; and (4) what is the proper recovery for Ms. Nolte and the class members against the Defendants.

149. **Typicality. Fed. R. Civ. P. 23(a)(3).** Ms. Nolte's claims are typical of the claims of each putative class member. In addition, Ms. Nolte is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

150. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Ms. Nolte is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class she seeks to represent; she has retained counsel competent and experienced in such litigation; and she has and intends to continue to prosecute the action vigorously. Ms. Nolte and her counsel will fairly and adequately protect the interests of the members of the class. Neither Ms. Nolte nor her counsel have any interests which might cause them not to vigorously pursue this action.

151. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such

individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by the Defendants' conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

152. The Defendants violated § 1962(d) of RICO by conspiring to violate § 1962(c).

153. The Defendants each knowingly agreed to participate in the scheme alleged herein that allowed the enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

154. This knowledge is evidenced in part by their knowledge of and agreement to the collection of unlawful debt, including in Indiana and other states with similar laws.

155. Ms. Nolte and the class members were injured as a result of the Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

156. The Defendants are jointly and severally liable in their individual capacities to Ms. Nolte and the RICO Class for actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## THIRD CAUSE OF ACTION
## DECLARATORY JUDGMENT

(**CLASS CLAIM AGAINST:** Dino Franklin Jr., *in his official capacity* as Tribal Chairman of the Kashia Band of Pomo Indians Tribal Council; Glenda Jacob McGill, *in her official capacity* as Vice Chair of the Kashia Band of Pomo Indians Tribal Council; Tara Antone, *in her official capacity* as Secretary of the Kashia Band of Pomo Indians Tribal Council; Savannah Gomes, *in her official capacity* as Treasurer of the Kashia Band of Pomo Indians Tribal Council; Marlene Adam, *in her official capacity* as Member at Large of the Kashia Band of Pomo Indians Tribal Council; Susan G. Smith, *in her official capacity* as Member at Large of the Kashia Band of Pomo Indians Tribal Council; and Elayne Muro, *in her official capacity* as Member at Large of the Kashia Band of Pomo Indians Tribal Council)

157.    Ms. Nolte realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

158.    Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, Ms. Nolte brings this claim for herself and on behalf of the "Declaratory Judgment Class," initially defined as follows:

> *All individuals who entered into a loan agreement with any of Kashia Services' subsidiaries and/or operating names (including but not limited to Oxford Financial Services; Spring Water Financial; Loan Star Cash; Solid Oak Finance; Geyser Lending; ReadySetGo Finance; Napa Lending; Inbox Loan; NetPDL; PDY Services; PDLNow; QXL Online; 123 Wages; ABC Wages; Inbox Credit; and Better Day Loans).*

Ms. Nolte is a member of the Declaratory Judgment Class.

159.    **Numerosity. Fed. R. Civ P 23(a)(1).** At this time, Ms. Nolte does not know the exact number of members of the Declaratory Judgment Class. However, based on the class sizes in similar cases, Ms. Nolte anticipates that there are likely thousands of members. Thus, the class is so numerous that joinder of all members is impracticable.

160.    **Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. The common questions include: (1) whether the Tribal Dispute Provision is invalid; and (2) whether the Governing Law provision is invalid.

161.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Ms. Nolte's claims are typical of the claims

of each putative class member. In addition, Ms. Nolte is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

162. **<u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4).** Ms. Nolte is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class she seeks to represent; she has retained counsel competent and experienced in such litigation; and she has and intends to continue to prosecute the action vigorously. Ms. Nolte and her counsel will fairly and adequately protect the interests of the members of the class. Neither Ms. Nolte nor her counsel have any interests which might cause them not to vigorously pursue this action.

163. **Declaratory Relief is Appropriate. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because the Defendants acted on grounds generally applicable to the class such that declaratory relief is appropriate respecting the class as a whole.

164. On behalf of herself and all others similarly situated, Ms. Nolte seeks declaratory relief that the Governing Law and Tribal Dispute Resolution provisions are unenforceable and unconscionable under federal and state law.

165. As required by 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

166. The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties to the loan agreements as well as the validity, if any, of the choice-of-law and forum-selection provisions.

# FOURTH CAUSE OF ACTION
## INDIANA UNIFORM CONSUMER CREDIT CODE
### (CLASS CLAIMS AGAINST ALL DEFENDANTS
### IN THEIR INDIVIDUAL CAPACITIES ONLY)

167. Ms. Nolte realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

168. Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, Ms. Nolte brings this claim for herself and on behalf of the "Indiana Consumer Class" initially defined as follows:

> *All individuals located in Indiana, who received a loan from Kashia Services' subsidiaries and/or operating names (including but not limited to Oxford Financial Services; Spring Water Financial; Loan Star Cash; Solid Oak Finance; Geyser Lending; ReadySetGo Finance; Napa Lending; Inbox Loan; NetPDL; PDY Services; PDLNow; QXL Online; 123 Wages; ABC Wages; Inbox Credit; and Better Day Loans).*

Ms. Nolte is a member of the Indiana Consumer Class.

169. Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, Ms. Nolte brings this claim for herself and on behalf of the "Indiana Consumer Small Loans Subclass" initially defined as follows:

> *All individuals located in Indiana, (1) who received a loan greater than $50 and less than $550 (2) from Kashia Services' subsidiaries and/or operating names (including but not limited to Oxford Financial Services; Spring Water Financial; Loan Star Cash; Solid Oak Finance; Geyser Lending; ReadySetGo Finance; Napa Lending; Inbox Loan; NetPDL; PDY Services; PDLNow; QXL Online; 123 Wages; ABC Wages; Inbox Credit; and Better Day Loans).*

Ms. Nolte is a member of the Indiana Consumer Small Loans Subclass.

170. Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, Ms. Nolte brings this claim for herself and on behalf of the "Indiana Consumer Small Loans Deceptive Act Subclass" initially defined as follows:

> *All individuals located in Indiana, (1) who received a loan greater than $50 and less than $550 (2) from Kashia Services' subsidiaries and/or operating names (including but not limited to Oxford Financial Services; Spring Water Financial; Loan Star Cash; Solid Oak Finance; Geyser Lending; ReadySetGo Finance; Napa Lending; Inbox Loan; NetPDL; PDY Services; PDLNow; QXL Online; 123 Wages; ABC Wages; Inbox Credit; and Better Day Loans).*

Ms. Nolte is a member of the Indiana Consumer Small Loans Deceptive Act Subclass.

171. **Numerosity. Fed. R. Civ. P 23(a)(1).** At this time, Ms. Nolte does not know the exact number of members of the classes. However, based on the class sizes in similar cases, Ms. Nolte anticipates that there are likely thousands of members. Thus, the class and subclasses are so numerous that joinder of all members is impracticable.

172. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The common questions include: (1) whether the loans were made and collected on in violation of Indiana's Uniform Consumer Credit Code for Small Loans; (2) whether the Defendants may be held liable pursuant to Indiana Code § 24-4.5-7-409(2)(d); and (3) what is the proper recovery for Ms. Nolte and the class members against each of the Defendants.

173. **Typicality. Fed. R. Civ. P. 23(a)(3).** Ms. Nolte's claims are typical of the claims of each putative class member. In addition, Ms. Nolte is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

174. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Ms. Nolte is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class she seeks to represent; she has retained counsel competent and experienced in such litigation; and she has and intends to continue to prosecute the action vigorously. Ms. Nolte and her counsel will fairly and adequately protect the interests of the members of the class. Neither Ms. Nolte nor her counsel have any interests which might cause them not to vigorously pursue this action.

175. **Superiority. Fed. R. Civ. P. 23(b).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is

superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by the Defendants' conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

176.     The Defendants, Kashia Services, and Kashia Services' subsidiaries are regularly engaged in the making and collection of loans in Indiana.

177.     Kashia Services and its subsidiaries were not licensed to make small loans in Indiana as required by applicable law.

178.     Because Kashia Services, its subsidiaries, and the Defendants failed to obtain the requisite license and charged excessive interest rates, the loans are null and void in Indiana.

179.     Through their individual conduct, each of the Defendants is a person that violated Ind. Code § 24-4.5-7-409.

180.     Through their individual conduct, each of the Defendants is a person that violated Ind. Code § 24-4.5-5-202.

181.     As alleged, Kashia Services, its subsidiaries, and the Defendants did not have a license to collect on the unlawful loans.

182.     As alleged, the Defendants charged interest rates of greater than 700% to Ms. Nolte and members of the class.

183. As alleged, the Defendants made misleading or deceptive statements regarding a small loan and engaged in unfair and deceptive practices in the collecting of small loans to Indiana consumers.

184. Accordingly, Ms. Nolte and Indiana Consumer Class members may disgorge the amounts received by the Defendants. Ind. Code § 24-4.5-5-202.

185. Additionally, Ms. Nolte and Indiana Consumer Small Loans Subclass members are entitled to damages pursuant to Ind. Code § 24-4.5-7-409 for each violation.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Regina L. Nolte respectfully requests that the Court enter judgment against the Defendants as follows:

A. An order certifying the proposed classes and subclasses under Fed. R. Civ. P. 23(b)(2) and (b)(3), and appointing Ms. Nolte as class representative and her counsel as class counsel, as soon as practicable;

B. An order declaring that the loan agreements are void and that Ms. Nolte and members of the putative class are not obligated to pay any outstanding balances on the loans;

C. An order declaring that the Governing Law and Tribal Dispute Resolution provisions are unenforceable by the Defendants;

D. An order awarding monetary damages against the Defendants in their individual capacities, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

E. An order awarding statutory damages against the Defendants in their individual capacities in accordance with proof and in an amount consistent with applicable precedent;

F. An order awarding interest at the maximum allowable legal rate against the Defendants in their individual capacities on the foregoing sums;

G.     An order awarding Ms. Nolte her reasonable costs and expenses of suit, including attorneys' fees against the Defendants, in their individual capacities; and

H.     Such further relief as this Court may deem just and proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,

*/s/ Neil K. Sawhney*
Neil K. Sawhney (State Bar No. 300130)
GUPTA WESSLER PLLC
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*neil@guptawessler.com*

Matthew H.W. Wessler*
GUPTA WESSLER PLLC
1035 Cambridge Street, Suite One
Cambridge MA 02141
(617) 286-2392
*matt@guptawessler.com*

Kristi C. Kelly*
Andrew J. Guzzo*
KELLY GUZZO PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7570
*kkelly@kellyguzzo.com*
*aguzzo@kellyguzzo.com*

*Attorneys for Plaintiff Regina Nolte*

* *pro hac vice* forthcoming